IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| WAYNE BERTRAM WILLIAMS, | : | |
| | : | |
| Petitioner, | : | CIVIL ACTION FILE |
| | : | NO. 1:02-CV-3362-BBM |
| v. | : | |
| | : | |
| BRUCE CHATMAN, Warden, | : | PRISONER HABEAS CORPUS |
| | : | 28 U.S.C. § 2254 |
| Respondent. | : | |

## ORDER AND OPINION

On February 8, 2006, this court entered an Order [Doc. 52] and Judgment [Doc. 53] dismissing Mr. Williams's 28 U.S.C. § 2254 habeas corpus petition. Within ten business days, Mr. Williams filed a motion seeking an extension of time to file a motion for reconsideration. [Doc. 54.] This court granted that motion, as well as two subsequent motions for more time. [Docs. 55-59.] Now before the court is Mr. Williams's "Motion for Reconsideration of Order, to Alter or Amend Judgment and For Relief from Judge's Order and Judgment," as amended [Docs. 60, 61], and the Response thereto [Doc. 62].

I.   **Fed. R. Civ. P. 59(e) and Fed. R. Civ. P. 60(b) Standards**

A party may seek relief from a judgment pursuant to either Fed. R. Civ. P. 59(e) or Fed. R. Civ. P. 60(b). To fall within the purview of Rule 59(e), the motion "shall be

filed no later than 10 days after entry of the judgment." Fed. R. Civ. P. 59(e). It appears that the Eleventh Circuit has not set forth the standard that a district court should employ in considering a Rule 59(e) motion in the post-conviction context. However, this court, in ruling on a motion seeking reconsideration of an order denying a § 2255 motion, has stated that "there are three primary grounds for reconsideration of a judgment: an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." United States v. Battle, 272 F. Supp. 2d 1354, 1357 (N.D. Ga. 2003) (Evans, C.J.). The movant "must demonstrate why the court should reconsider its decision and set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." Id. (internal quotations omitted). The decision whether or not to grant a Rule 59(e) motion is "committed to the sound discretion of the district judge." Am. Home Assurance Co. v. Glenn Estess & Assocs., 763 F.2d 1237, 1238-39 (11th Cir. 1985).

In pertinent part, Rule 60(b) provides relief from a final judgment for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . ., misrepresentation, or other misconduct of an adverse party; . . . or (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b).  A Rule 60(b) movant "must demonstrate a justification for relief so compelling that the district court [is] *required* to grant [his] motion."  Rice v. Ford Motor Co., 88 F.3d 914, 919 (11th Cir. 1996).  Moreover, Rule 60(b)(6) provides "an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances."  Id.  A Rule 60(b) motion is also committed to this court's discretion.  See  Am. Bankers Ins. Co. of Fla. v. Nw. Nat'l Ins. Co., 198 F.3d 1332, 1338 (11th Cir. 1999).

## II.    Mr. Williams's Grounds for Reconsideration

Mr. Williams complains generally that he was caught off guard by the court's February 2006 Order denying his habeas petition without giving him "the opportunity to brief fully this matter."   [Doc. 60 at 2-3.]   A full response to this argument requires a review of the procedural history of this case.

Mr. Williams filed this habeas action on December 13, 2002.  Three months later, Mr. Williams, together with the Respondent, set a schedule for themselves, which was approved by the Magistrate Judge[1] and which provided that Mr. Williams

---

[1] 28 U.S.C. § 636(b)(1)(B) provides that a United States District Judge may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by [the district] judge . . ., of applications for posttrial relief made by individuals convicted of criminal offenses."  The statute requires, therefore, that the reference of Mr. Williams's habeas action to the Magistrate Judge eventually come to an end, and the case ultimately be decided by the District Judge.

would file his amended petition, or indicate that he would proceed with the original petition, by June 15, 2003, and that he would file any motions for hearings and/or discovery by August 30, 2003.

On June 9, 2003 -- days before Mr. Williams's amended petition was first set to be due, the  deadline for that submission was moved, by Order of the Magistrate Judge, to July 27, 2003.  On September 25, 2003, the deadline for the amended petition was extended again to December 3, 2003.  On December 5, 2003, the Magistrate Judge entered another Order extending the deadline to January 5, 2004.  On January 23, 2004, the Magistrate Judge entered another Order extending the deadline for the amended petition to February 23, 2004.  Ultimately, Mr. Williams's amended petition was filed on that date.

On March 18, 2004, the Magistrate Judge entered an Order setting a deadline for  Mr. Williams to file motions for hearing and/or discovery by July 5, 2004.  On April 30, 2004, Respondent moved for, *inter alia*, an extension until August 2, 2004 for Mr. Williams to file any motions for hearings and/or discovery.  The Magistrate Judge granted the extension on May 7, 2004.  On August 3, 2004, Mr. Williams  moved for an extension, which the Magistrate Judge granted that same day, allowing him until October 4, 2004 to file any motions for hearings and/or discovery.  Mr. Williams then moved for another extension, which was granted by the Magistrate Judge on

October 7, 2004, which set the deadline for Mr. Williams to file any motions for hearings and/or discovery on or before November 4, 2004.  Mr. Williams filed a Motion for Discovery on November 4, 2004.

On May 31, 2005, the Magistrate Judge issued an Order granting Mr. Williams's Motion for Discovery.  The Respondent sought a de novo review of the Magistrate Judge's Order from this court.  In fairly short order after the briefing on this discovery issue was completed for this court, a ruling was issued that discovery could go forward, and the discovery sought by Mr. Williams was produced.  The Magistrate Judge held a telephone conference with counsel for the parties on November 2, 2005 and, according to the minutes of that teleconference, set the "final" discovery teleconference for November 9, 2005 at 2:00 p.m.

During this time, this court became concerned about the extended delay in this case.  The undersigned had been having ongoing conversations with the Magistrate Judge regarding what needed to be done in order to get the case ready to give Mr. Williams a ruling on his Petition.  This court was concerned because Mr. Williams's Petition had been pending for three years at the time this court revoked the reference to the Magistrate Judge.  The Magistrate Judge advised this court that in her teleconference with the parties, she posed the question to counsel as to whether any further briefing would be necessary, and was told that none further was needed.  The

Magistrate Judge advised this court of that response from counsel, and on December 14, 2005, this court revoked the reference to the Magistrate Judge.[2]  The court revoked the reference to the Magistrate Judge with the understanding that the record before it was complete, and with the intention of ruling on Mr. Williams's long pending Petition as soon as possible.[3]

Based upon this record, the court quite takes exception to Mr. Williams's suggestion that he was not given sufficient time "to brief fully" his habeas corpus claims.  The docket reflects no substantive filing from Mr. Williams between the time he filed his 12-page Motion for Discovery on November 4, 2004 and the time this court denied his Petition on  February 8, 2006.  Neither did this court have any hint from Mr. Williams, between the time it revoked the reference to the Magistrate Judge

---

[2]The docket reflects in a "remark" entered on December 12, 2005 that a teleconference was scheduled for December 14, 2005 at 1:30 p.m. with the Magistrate Judge.  While the undersigned has no independent recollection of the exact calendar date when this "final" discovery teleconference took place, the undersigned specifically remembers speaking with the Magistrate Judge after her final conversation with counsel in this proceeding, and shortly thereafter (if not simultaneously), revoking the reference to the Magistrate Judge.

[3]In hindsight, the undersigned regrets not personally speaking with counsel, as opposed to relying on the conversations had by the Magistrate Judge.  The court also regrets, obviously, that the conversation had with counsel by the Magistrate Judge was not taken down by a court reporter.  Ultimately what matters most to the court about this argument is that Mr. Williams's counsel has said publicly, and the court therefore presumes privately to Mr. Williams, that Mr. Williams's Petition had been treated lightly by this court.  Nothing could be further from the truth.

on December 14, 2005 and the time it issued the Order denying the Petition on February 8, 2006, that he wished to make any filings.

Further, the record amply demonstrates that Mr. Williams could have sought, and would have received, leave to file any number of briefs and memoranda in support of his 146-page amended habeas petition during the more than three year pendency of this case. The docket does not reflect one instance in which either party to this litigation ever asked for and did not receive an extension of time to file whatever that party felt appropriate to file.

Mr. Williams *has* now filed a brief. The docket reflects that Mr. Williams asked for and received four months from the date of this court's denial of his habeas petition in which to file his Motion for Reconsideration. Presumably, this is a sufficient time period to formulate all viable arguments. While Mr. Williams asserts that if he had been given the opportunity at an earlier date to file a brief, he would have included arguments then which he does not include now, the court does not understand why he would make such a choice. In any event, the court will now address the substantive arguments which have been made by Mr. Williams in his Motion for Reconsideration.

**A.**   **The whereabouts of Daryl Davis on January 3, 1981 -- Ground 1(n) from the amended petition**

Mr. Williams's first specific claim is that this court erred "in its conclusions concerning [his] newly discovered information about Daryl Davis[] being incarcerated at the Augusta Youth Development Center [YDC] on January 3, 1981, the same time at which Davis testified seeing [Petitioner], [murder victim] Lubie Geter and another black male . . . in Atlanta."  [Doc. 60 at 3-4; see Doc. 52 at 110-16 (discussing Mr. Williams's Ground 1(n) claims).]   Mr. Williams states that the June 26, 2003 declaration of Mr. Carlton Eugene Jones is newly discovered evidence demonstrating that Mr. Davis could not have been in Atlanta on January 3, 1981, because he was incarcerated in the Augusta YDC with Mr. Jones from at least April 1980 until at least February 6, 1981.  [Id. 4-5; see Doc. 32 Ex. A.]  Mr. Williams argues that this court "missed the essential point" about this newly discovered evidence when it concluded that his Ground 1(n) claims failed because, at the time of his trial, his defense team had information about Mr. Davis's criminal history.   [Doc. 60 at 4-5.]

Mr. Williams acknowledges that "the Department of Juvenile Justice no longer has records to confirm or deny what Mr. Jones states in his affidavit," but Mr. Williams "respectfully requests an evidentiary hearing on this point to flush out

further the relevant facts," such as "sporting type records from the Augusta YDC itself, which [he] believes would confirm Mr. Jones'[s] statements" that Mr. Davis participated in the boxing program at the YDC during the relevant time frame. [Id. 5.] Mr. Williams also claims to have discovered a Supplementary Offense Report, dated January 15, 1981, "reflecting an incident with Davis on January 9, 1981," when two police officers "encountered [him] in the possession of an alleged stolen [television]. . . . and *took him to the Fulton County Juvenile facility.*" [Id. 5-6 (emphasis added).]

> Respondent objects that Mr. Williams
>
> has yet to even suggest [that] he obtained any information of relevance [during the lengthy discovery period for this habeas action,] and now just states [that] he wants a hearing to present evidence without giving the court any clue what the evidence might be, how he obtained it, when he obtained it and why [it] has never been proffered to the court.

[Doc. 62 at 8.]  This objection is well-taken.  In order to prevail on the instant Motion for Reconsideration, Mr. Williams must "set forth facts or law of a strongly convincing nature" to warrant the conclusion that this court's February 2006 Order was erroneous or unjust.  See Battle, 272 F. Supp. 2d at 1357 (internal quotations and citation omitted).

Mr. Williams claims to have a police report regarding Mr. Davis, ostensibly constituting newly discovered evidence, but he has not provided the court with a

copy of that report.   Furthermore, and importantly, the report's alleged contents contradict Mr. Carlton Jones's declaration, the other "newly discovered" evidence upon which Mr. Williams relies.   Mr. Jones's declaration places Mr. Davis in the Augusta YDC during the entire month of January 1981, whereas the police report places him in Fulton County, i.e., in Atlanta, on January 9, 1981.  Mr. Williams cannot have it both ways.  Moreover, as Respondent points out, Mr. Jones's memory of that time appears sketchy at best, given that he cannot remember his exact age ("14 or 15 years old") or the exact month ("March or April of 1980") when he was placed in the Augusta YDC and first came to know Mr. Davis.  [See Doc. 32 Ex. A ¶¶ 2-4.]  In sum, Mr. Williams has not presented any evidence, newly discovered or otherwise, to convince the court that its previous denial of his Ground 1(n) claims was erroneous or unjust.

B.    **The procedural default of Mr. Williams's claim regarding murder victim Clifford Jones -- Ground 2(a) from the amended petition**

Mr. Williams next argues that, contrary to the court's conclusion in its February 2006 Order, he did not procedurally default his claim of prosecutorial misconduct with respect to murder victim Clifford Jones.[4]  [Doc. 60 at 7.]  In his state

---

[4]In his amendment to the instant Motion for Reconsideration, Mr. Williams notes that previously he incorrectly referred to Clifford Jones as a pattern murder victim.  [Doc. 61 at 1.]

habeas petition, Mr. Williams claimed that the State withheld the "full statements" of various witnesses concerning the brutal rape and murder of Clifford Jones -- implicating others in the murder, not Mr. Williams -- and "only released summaries of the statements" instead, which did not "describe the propensities of the people surrounding Clifford Jones'[s] murder."  [Resp't Ex. 24 Part 1B, 502-03.] Mr. Williams also asserted that the State "failed to include the Clifford Jones murder in the pattern despite the fact that an alleged 'greenish yellow nylon fiber' was retrieved from his body [that] was similar to [the fibers in] petitioner's home carpet."[5]   [Id.]   In his instant Motion for Reconsideration, Mr. Williams argues

> that the so-called unique green fiber found on Clifford Jones was the centerpiece of the State's fiber evidence argument that suggested Petitioner's home environment was identifiable because it was unique. Prosecutorial misconduct is evident considering the fact that all other cases with this fiber were made a part of the pattern.   Numerous documents which are clearly exculpatory to Petitioner unequivocally show the involvement and responsibility of others for this murder. These documents were blatantly suppressed.

[Doc. 60 at 7-8.]

Respondent objects that no evidence regarding the Clifford Jones murder was used at Mr. Williams's trial, so that the relevance of the allegedly withheld evidence is not apparent.   [Doc. 62 at 9.]   Respondent notes that one of the prosecutors at Mr.

---

[5]It appears that the state habeas court never addressed this Ground 2(a) claim.  [See Resp't Ex. 24 Part 5B, 3201-60; Doc. 36 (Resp't Ex. 28D, 1-121).]

Williams's trial, Mr. Joseph Drolet, testified at the state habeas evidentiary hearing that "the supposed killer [of Mr. Clifford Jones] turned into no suspect at all," and Mr. Jones was not included as a pattern murder victim because it was only after Mr. Williams's trial that one of the fibers recovered from Mr. Jones's body was matched to a source in Mr. Williams's home environment.  [Id. 9-10.]  Respondent argues that "[t]he fact that the state chose not to present evidence of a different crime because of a concern about the evidence does not set forth a constitutional violation."  [Id. 10.]

Although Mr. Williams couches the Ground 2(a) claim from his amended petition in terms of prosecutorial misconduct, his actual claim is that the State withheld exculpatory material in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  This court discussed Mr. Williams's numerous Brady claims at length in its February 2006 Order.  [See Doc. 52 at 48-156.]  The court finds nothing of substance set forth in Ground 2(a) of Mr. Williams's amended habeas petition to alter its previous conclusion with respect to his Brady claims.  There is no reasonable probability that the allegedly exculpatory evidence that the State allegedly withheld from Mr. Williams --  considered cumulatively, including the evidence set forth in Ground 2(a) -- would have altered the outcome of his trial had it been introduced into evidence at that trial.

It appears to the court, in fact, that Mr. Williams's defense team knew the general nature and even many of the details of the police investigation into Clifford Jones's murder, and also knew that a "greenish yellow nylon fiber" similar to the fibers gathered from the carpet in Mr. Williams's home had been discovered on Mr. Jones's body.  [See Resp't Ex. 24 Part 1B, 503.]  Moreover, the State's use of fiber evidence from Mr. Williams's home environment to link him to the murder victims was based on the retrieval from the victims' bodies of many different fibers, not only "greenish yellow" carpet fibers, that also were retrieved from Mr. Williams's home environment.  [See Doc. 52 at 43-48, 58-61, 244.]  Accordingly, to the extent that Mr. Williams did not default the claim set forth in Ground 2(a), that claim lacks arguable merit.  Therefore, to the extent that the court's failure to address this Ground 2(a) claim on the merits in its February 2006 Order warrants reconsideration, the court concludes that the denial of that claim was neither erroneous nor unjust.

## C.    The "8100 file" investigation into the child murders -- Ground 1(a) from the amended petition

Mr. Williams next reprises the arguments he presented in Ground 1(a) of his amended habeas petition that if the jury had heard evidence collected in the "8100 file" during the police investigation into possible Ku Klux Klan involvement in the Atlanta child murders, "including an admission by a viable suspect that he had killed

a specific individual who's [sic] murder was attributed (though uncharged) to Petitioner, there is a reasonable probability of a different verdict" at his trial.  [Doc. 60 at 8-9.]  As noted in this court's February 2006 Order, however, State authorities closed the 8100 file before Mr. Williams became a suspect in the Atlanta child murders "because they had concluded that none of the individuals being investigated were legitimate suspects."  [Doc. 52 at 68.]  Mr. Williams has offered the court no basis upon which to alter or amend its conclusion with respect to his Ground 1(a) claim, and the court will not do so.

**D.     The admission of other crimes evidence at trial -- Ground 3 from the amended petition**

Mr. Williams next reprises, with embellishments, the arguments he presented in Ground 3 of his amended habeas petition that the State's introduction at his trial of evidence regarding the so-called pattern murder victims violated his constitutional rights. [Doc. 60 at 9-13.]  Mr. Williams offers no new evidence or change in the law suggesting that this court's February 2006 Order was mistaken.  Accordingly, there is no basis for the court to reconsider its prior conclusion that the admission at Mr. Williams's trial of the evidence regarding the ten pattern murder victims did not deprive him of his due process right to a fundamentally fair trial as guaranteed by the United States Constitution.  [See Doc. 52 at 176-88.]

E.    __The re-opening of DeKalb County's investigation into the child__
__murders__

Mr. Williams's final two grounds for reconsideration are based on allegedly new evidence never presented previously to any court.  First, Mr. Williams states that the DeKalb County Police have re-opened their investigation into six of the Atlanta child murders, including three murders about which evidence was introduced at Mr. Williams's trial.  [Doc. 60 at 13-14.]  Mr. Williams claims that, in deference to the DeKalb County Police Chief, his counsel declined to press for information about the on-going investigation until it was completed, but "[d]uring the interim period, to the surprise of counsel, because no merits briefing had occurred, the Court issued its Order denying [his] habeas corpus petition, before this investigation could be completed and the information made available to Petitioner for presentation to the Court for its consideration."  [Id. 14.]

Mr. Williams claims that, prior to his arrest, the DeKalb County Police had assembled a considerable amount of exculpatory evidence regarding the possible involvement of another individual, who is now incarcerated in a Georgia prison for child molestation, in the murders of Curtis Walker, Eddie Duncan, and possibly other Atlanta child murder victims.  Mr. Williams states that "this new information never materialized in this case prior to the Court's [February 2006] Order."  [Id. 15.] Mr.

Williams acknowledges, however, that the existence of this evidence has come to his attention largely "upon information and belief." [Id. 14-15.] Finally, Mr. Williams claims that, pursuant to an ostensibly recent discovery request to the Georgia Bureau of Investigation, he has uncovered a CD-ROM containing information regarding this same suspect. [Id. 16.] Mr. Williams seeks an opportunity to present evidence on this matter in camera, to reopen discovery to explore the matter further, and eventually to brief the issue. [Id.]

Respondent's objections to this claim can be summarized as follows, to borrow from a famous description of a city in California: "There is no there, there." [See Doc. 62, 12-14.] Respondent notes that Mr. Williams was given the opportunity to issue a subpoena to the DeKalb County Police Department and to present evidence under seal regarding a possible suspect under investigation by that department, but he failed to do so. Respondent also notes that Mr. Williams "has not even now suggested [that] DeKalb County has completed whatever investigation . . . he is seeking." [Id. 12.] Respondent notes further that neither Curtis Walker nor Eddie Duncan was a pattern murder victim, and that Mr. Williams has done nothing more than suggest

> that he knows (somehow) of an 'unnamed suspect' known by DeKalb County prior to Petitioner's arrests [sic] . . . and that he has now 'been informed' of other information. Petitioner does not state what the evidence is [or] how he became aware of it, . . . [nor does he] suggest that there is a legitimate suspect

-16-

for any murder about which evidence was introduced at his trial.  [Id. 12-13.]

Once again, Respondent's objections are well-taken.  If Mr. Williams had some actual evidence to present, not based "upon information and belief," he could have and should have presented it in conjunction with this Motion for Reconsideration. It is not proper for this court to string this case out endlessly in the hope that somehow Mr. Williams may someday find some exculpatory evidence that will be so convincing as to overturn the considered judgments of the many courts (including this one) that have presided over or reviewed his criminal proceedings and concluded that they pass constitutional muster.

**F.**     **The comments of a former medical examiner during a television documentary**

Finally, Mr. Williams presents a truly novel claim regarding "a transcript from a Granite Productions documentary for a European television network about Petitioner's case," which "reports an interview with Dr. Joseph Burton, a former Medical Examiner for DeKalb and Cobb Counties," who performed the autopsies for the child murder cases in those counties.  [Doc. 60 at 16; Doc. 61 at 2.]  Although Mr. Williams has neither informed the court when the documentary was produced nor submitted the actual transcript, he appears to reproduce parts of it verbatim in the text of his Motion, indicating that Dr. Burton stated during his interview for the

documentary that at least <u>some</u> of the fiber evidence used to convict Mr. Williams "was hooey." [Doc. 60 at 17.] According to the "transcript," Dr. Burton planted a "very common yellow fiber" on at least one of the murder victims, which "became a fiber that . . . linked several victims together." Dr. Burton also stated that "50 percent of those fibers that were presented were fibers that could have been on all of us as well, basically." [<u>Id.</u> 17-18.] Mr. Williams argues that this statement by Dr. Burton, which "should have been brought before the trial court and jury, . . . in all likelihood would have had very serious repercussions for the State's case." [<u>Id.</u> at 18.] According to Mr. Williams, Dr. Burton's comments, coupled with an alleged recent admission by Dr. Deadman, one of the State's testifying fiber experts, that he, Dr. Deadman, had given erroneous testimony about the fiber evidence, places the reliability of that fiber evidence "into serious question." [<u>Id.</u>]

Respondent objects that not only has Mr. Williams failed to produce the actual transcript of Dr. Burton's alleged comments, but his description of the source of those comments is so sketchy as to be useless. [Doc. 62 at 14.] Respondent also notes that Dr. Burton's comments are hearsay statements and, furthermore, do not support any claim in Mr. Williams's habeas petition because the State never attempted to connect Mr. Williams to the Atlanta child murders via "common fibers," but rather did so via "uncommon" fibers retrieved from the bodies of the victims that matched fibers

found in Mr. Williams's home environment.   [Id. 14-15.]   Finally, to the extent that

this court has already been pointed to hearsay evidence in ruling on the instant

Motion for Reconsideration, Respondent points out as well that, in an interview

conducted after this Motion was filed, Dr. Burton stated that he had performed an

"experiment" by placing a fiber from his own shirt onto the body of a child murder

victim, and, as expected, the crime laboratory had reported that the fiber was too

common to be used as evidence, all of which had occurred before Mr. Williams

became a suspect.   Respondent adds that no evidence regarding this victim was

introduced at Mr. Williams's trial.   [Id. 15]; see R. Robin McDonald, _Williams' Last-_

_Ditch Plea Cites Bogus Fiber,_ Fulton County Daily Report, June 12, 2006, at 1, 6-7

(noting Dr. Burton's insistence that the yellow fiber at issue "has never been among

the evidence in the case against [Petitioner]").

As noted supra, the fiber evidence against Mr. Williams involved a group of

fibers that the State's fiber experts considered uncommon enough that "each

individual [fiber] association or each additional association add[ed] to the

significance and . . . [led] to a conclusion that . . . 11 [of the 12] victims in this case . . .

are, in fact, linked . . . positively to [Mr. Williams's] environment." [Doc. 52 at 244

(trial testimony of Dr. Deadman, a Federal Bureau of Investigation fiber expert).]

There is no suggestion in the massive record of Mr. Williams's criminal and post-

conviction proceedings that a "common yellow fiber" was used to link Mr. Williams to the murder victims or, for that matter, that Dr. Burton ever mentioned his "experiment" to anyone prior to the aforementioned interviews. Moreover, the court finds it significant that Mr. Williams has not attempted to explain how, in light of Dr. Burton's Daily Report interview, his television documentary interview has the slightest relevance. Accordingly, Mr. Williams's final claim does not warrant reconsideration of this court's February 2006 Order.

## III.   Conclusion

For each of the foregoing reasons, Mr. Williams's Motion for Reconsideration, as amended [Docs. 60, 61], is **DENIED**.

**IT IS SO ORDERED**, this 17th day of October, 2006.


s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE